# In the United States Court of Federal Claims

No. 18-1615 C
Filed: April 1, 2019
Reissued: April 22, 2019[1]

| | |
|---|---|
| AGILE DEFENSE, INC., Plaintiff, v. THE UNITED STATES, Defendant, and FEDITC, LLC, Defendant-Intervenor. | Post-Award Bid Protest; RCFC 52.1; Judgment on the Administrative Record; Administrative Record; Cost Realism Analysis; Misleading Discussions |

*Stephanie Diane Wilson*, Berenzweig Leonard, LLP, McLean, VA, for plaintiff.

*Barbara E. Thomas*, U.S. Department of Justice, Civil Division, Washington, DC, for defendant.

*Jeffery Mitchell Chiow*, Rogers Joseph O'Donnell, PC, Washington, DC, for defendant-intervenor.

**OPINION AND ORDER**

***SMITH*, Senior Judge**

This post-award bid protest comes before the Court on the parties' Cross-Motions for Judgment on the Administrative Record. Plaintiff, Agile Defense, Inc. ("Agile"), challenges the decision of the United States, acting through the Defense Information Systems Agency ("DISA" or "Agency"), to exclude Agile from its twenty lowest-priced, technically acceptable offerors in Request for Proposal HC1028-15-R-0030 ("Solicitation" or "RFP"). The Solicitation is for ENCORE III, a multiple award contract awarding Fixed Price ("FP") and Cost-Reimbursement ("CR") task orders to provide "information technology (IT) solutions for the development, installation, fielding, training, operation and life-cycle management of components and systems

[1] An unredacted version of this opinion was issued under seal on April 1, 2019. The parties were given an opportunity to propose redactions, and those redactions are reflected herein.

in the operational environments of Combatant Commands and their subordinate components, the military services, Defense agencies, Office of the Secretary of Defense and other Federal agencies." Administrative Record (hereinafter "AR") 1784. In its Motion for Judgment on the Administrative Record, plaintiff asserts that the Agency's cost realism analysis was arbitrary and capricious, an abuse of discretion, and violated the express terms of the Solicitation, and that the Agency's misleading discussions with Agile were arbitrary and capricious and an abuse of discretion. *See generally* Plaintiff's Motion for Judgment on the Administrative Record (hereinafter "Pl.'s MJAR"). Included in this bid protest is FEDITC, LLC ("FEDITC"), the defendant-intervenor and one of the twenty lowest-priced, technically acceptable offerors. For the following reasons, defendant and defendant-intervenor's Cross-Motions for Judgment on the Administrative Record are granted, and plaintiff's Motion for Judgment on the Administrative Record is denied.

## I. Background

### A. Factual Background

On March 2, 2016, the Agency issued the Solicitation for the ENCORE III procurement, a follow-on to the ENCORE II contract. *See* AR 1. The Solicitation sought to meet the Department of Defense's ("DoD") effort to "achieve information superiority" by providing information technology ("IT") solutions to the military service branches, the DoD, and other federal agencies. *See id.* at 1784. DISA provided for award under the ENCORE III contracts to two separate sets or "suites" of twenty offerors—"full and open" competition for offerors regardless of their size and offerors specifically qualifying as "small business concerns." *See id.* at 1891.

The selection process for the small-business suite was based upon a best value lowest price, technically acceptable evaluation in accordance with Federal Acquisition Regulation ("FAR") 15.3, whereby the Agency would award up to twenty Indefinite-Delivery/Indefinite Quantity ("ID/IQ") contracts, providing for both FP and CR type task orders to be issued under the contract. *Id.* at 1781, 1891, 1909. The Solicitation afforded awardees a "fair opportunity to be considered for specific task and delivery orders issued against the ENCORE III contract." *Id.* at 1781. DISA was authorized to award not more than $17,500,000,000.00 over ten years, to be divided into two five-year terms. *Id.* at 1782. Contractors chosen would need to "provide all materials, services, personnel, planning, direction, coordination, and control necessary to provide the services required." AR 1786.

The Agency chose awardees based on three sets of evaluation factors: (1) Technical/Management Approach; (2) Past Performance; and (3) Cost/Price. *See id.* at 1899–1901. The Cost/Price factor required offers to include a price narrative and a pricing spreadsheet. *See id.* at 1901. For the pricing spreadsheets, offerors calculated their FP labor rates and CR labor rates for each different type of job, defined as an ENCORE III labor category ("LCAT"), that an awardee would likely need to fill in order to perform the various types of work required by an ENCORE III task order. *See id.* at 1902 (describing a total of 116 LCATs). The Solicitation required that FP and CR labor rates were to "include all direct, indirect, general and administrative costs, and profit associated with providing the required skill." *Id.* at 1904.

The price narrative was to contain information on "[p]ricing methodology and all supporting cost information of [CR] labor rates." *Id.* at 1901. For direct labor rates—the actual proposed hourly compensation—offerors were to include information such as "payroll records [and] salary survey data" in their price narrative. AR 1902.

The Solicitation also outlined how the Agency would evaluate offers. After calculating the labor rates for each LCAT and increasing the rate for each year beyond the first year, Agency evaluators multiplied the LCAT rates by the estimated hours required per year, totaling the amount for each LCAT per year. *See id.* at 1902, 1910. The sum of the amounts to be spent on all LCATs over the lifetime of the contract yielded each offeror's "Total Proposed Price." *Id.* at 1910.

For the CR portion of the Solicitation, the Agency was required to determine whether the CR rates were "complete, reasonable, and realistic" by using techniques found in FAR 15.404 to determine the Most Probable Cost of each offeror. *Id.* at 1910, 1918–19. The Most Probable Cost for the CR portion of each proposal required the cost/price team to calculate the average of all CR rates proposed by all offerors within the small business suite for each LCAT. *See id.* at 1919. The cost/price team would then calculate the dollar amount that fell one standard deviation below each average rate for every LCAT. *See id.*

For each LCAT within each offeror's proposal, the cost/price team "consider[ed] a rate that is 1 standard deviation below the average to be a realistic rate, subject to cost analysis techniques in accordance with FAR 15.404." *See* AR 1919. Rates falling *below* that range required evaluators to "review the submitted supporting documentation at the component level for that rate." *Id.* If the supporting documentation provided "inadequate or no justification . . . for any component of that rate," the evaluators "adjust[ed] the fully burdened CR labor rate to be equal to the average." *Id.* If the offeror provided adequate supporting documentation, then the rate would not be adjusted. *See id.* This cost realism analysis provided the Agency with the most probable CR labor rates for each LCAT, which were multiplied by the estimated labor hours required per year, resulting in each offeror's Most Probable Cost for the CR portion of the proposal.

After completing the cost/price evaluation, the Agency calculated the Total Evaluated Price ("TEP") by adding the "Total Proposed Price for the FP portion of the proposal to the Most Probable Cost for the CR portion of the proposal." *Id.* at 1910. Finally, the Solicitation instructed the Agency to rank offeror proposals by TEP. *See id.* The offerors with the twenty lowest TEPs were then evaluated for "compliance with other terms and conditions" outlined in the Solicitation. AR 1910, 1920.

As part of its justification for its FP and CR direct labor rates, Agile relied on the [redacted] . *See id.* at 2033. The [redacted] listed the annual salaries paid to the [redacted] percentile of employees within a specified labor category. *See id.* at 2048. Agile coordinated each LCAT to a corresponding [redacted] labor category, approximately matching the education and years of experience in each [redacted] category to the education and years of experience required by each LCAT. *See id.* at 2041–47.

After matching the LCAT to an [redacted] category, Agile chose a survey percentile "between the [redacted] and the [redacted] percentile depending on skill mix, complexity of various disciplines, and professional job difficulty" required under the LCAT. *Id.* at 2036. Agile used the [redacted] to develop its direct labor rates in its FP labor rates and CR labor rates. *See, e.g.*, AR 2176–77, 2182–83.

After offerors submitted their initial proposals, the Agency established a competitive range of thirty offerors. *See id.* at 79515. The Agency engaged in four rounds of Evaluation Notices ("EN") between September 25, 2017, and April 24, 2018, with a Final Proposal Revisions ("FPR") deadline of May 2, 2018. *See id.* at 78208. Agile received ENs during Rounds 1 and 2. *See generally* AR 6779–86; AR 22274–75. The Agency determined that Agile adequately resolved these ENs through its responses. *See id.* at 77021–22. As Agile did not receive any Round 4 ENs, the Agency sent Agile a letter requesting it to submit its FPR by May 2, 2018. *See id.* at 67568. Agile submitted its FPR on May 2, 2018. *See id.* at 50911–51158.

After reviewing the FPRs, DISA concluded that issuing an additional round of ENs was necessary for some offerors, including Agile, to "address[] outstanding issues," and set a June 20, 2018 deadline for a second round of FPRs. *Id.* at 79515. During review of Agile's first FPR, the Agency found that Agile's proposal had fifty CR rates and seventy-five FP rates more than one standard deviation below the average, requiring the Agency to conduct a cost realism analysis on those fifty CR labor rates. *See id.* at 65392, 65395. During its cost realism analysis of the fifty CR labor rates, the evaluators found a potential mismatch in the [redacted] data Agile used to support its direct labor rates, and, as a result, the Agency expanded its cost realism analysis to all CR labor rates. *See* AR 65392. The Agency stated that "[w]hile the proposed education and experience levels provided in the offeror's Price Template meet minimum required levels of the [Solicitation], the education and experience levels listed in the direct labor supporting documentation do not appear to meet the minimum required levels given in [the LCAT descriptions] for 66 labor categories." *Id.* at 65393.[2] The Agency conducted an upward adjustment to the average of the CR labor rates found within the sixty-six LCATs with this discrepancy. *Id.* at 65393. While Agile's FP labor rates were developed using the same methodology, Agile's FP labor rates were not adjusted. *See id.* at 65395. Within these sixty-six LCATs, there were only thirty distinct LCATs where Agile's proposed labor rates were more than one standard deviation below the average. *See* Pl.'s MJAR Exhibit 1. The Agency communicated this problem to Agile through Agile-COST-6A submitted to Agile in EN Round 5, with Agile's response and second FPR due June 20, 2018. *See* AR 65498.

Agile made significant changes to its second FPR and, on June 20, 2018, it submitted its response to the Round 5 EN. *See id.* at 68262–69. Importantly, Agile changed the [redacted] category for thirty-nine of the LCATs identified in EN 5 by exceeding the levels required by the Solicitation. *Compare* AR 25637 *with* AR 68292 (substituting an [redacted] category using three to five years of experience for an [redacted] category using six to eight years of experience when the LCAT required five years of experience). For the other twenty-seven

[2] For example, the discrepancy addressed by the Agency arose where an LCAT required at least six years of experience and Agile's [redacted] category provided for an employee with three to six years of experience.

LCATs identified by EN Round 5, Agile used a labor category from the [redacted] instead of from the [redacted]. *See id.* at 68270, 68284–90. Agile's Total Proposed Price ("TPP") increased from [redacted] in its first FPR to [redacted] in its second FPR. *See id.* at 77015. The Agency evaluated Agile's second FPR and deemed its CR rates realistic, thereby making Agile's TPP equal its Total Evaluated Price ("TEP"). *See id.* at 77019. On August 24, 2018, the Agency announced the twenty awardees in the small business set-aside suite for ENCORE III, with Agile absent among them. *See id.* at 79507–08.

### B. Procedural Background

On October 18, 2018, Agile filed its Complaint with this Court. On November 15, 2018, Agile filed its Amended Complaint. *See generally* Amended Complaint (hereinafter "Am. Compl."). Agile filed its Motion for Judgment on the Administrative Record on November 20, 2018, challenging the Agency's cost realism analysis, evaluation of labor rates, and discussions held with Agile. *See generally* Pl.'s MJAR. Both defendant and defendant-intervenor filed their Cross-Motions for Judgment on the Administrative Record and Responses to Plaintiff's Motion for Judgment on the Administrative Record on December 21, 2018. *See generally* Defendant's Cross-Motion for Judgment on the Administrative Record and Response to Plaintiff's Motion for Judgment on the Administrative Record (hereinafter "Def.'s CMJAR."); Intervenor's Opposition to Plaintiff's Motion for Judgment on the Administrative Record and Cross-Motion for Judgment on the Administrative Record (hereinafter "Def.-Int.'s CMJAR").

On January 4, 2019, plaintiff filed its Reply in Support of its Motion for Judgment on the Administrative Record and Response to Defendant's and Defendant-Intervenor's Cross-Motions for Judgment on the Administrative Record. *See generally* Plaintiff's Reply in Support of its Motion for Judgment on the Administrative Record and Response to Defendant's and Defendant-Intervenor's Cross-Motions for Judgment on the Administrative Record (hereinafter "Pl.'s Reply"). Defendant and defendant-intervenor each filed a Reply in Support of its Cross-Motion for Judgment on the Administrative Record on January 22, 2018. *See generally* Defendant's Reply in Support of its Cross-Motion for Judgment upon the Administrative Record (hereinafter "Def.'s Reply"); Intervenor's Reply in Support of its Cross-Motion for Judgment on the Administrative Record (hereinafter "Def.-Int.'s Reply"). The Court held oral argument on these motions on February 5, 2019. The parties' motions are fully briefed and ripe for review.

## II. Standard of Review

This Court's jurisdictional grant is found primarily in the Tucker Act, which provides the Court of Federal Claims with the power "to render any judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2012). Although the Tucker Act explicitly waives the sovereign immunity of the United States against such claims, it "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). Rather, to fall within the scope of the Tucker Act, "a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part).

The Tucker Act also affords this Court with jurisdiction over bid protest actions. 28 U.S.C. § 1491(b). This Court evaluates bid protests under the Administrative Procedure Act's ("APA") standard of review for agency actions. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). Notably, agency procurement actions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 28 U.S.C. § 1491(b)(4). However, "[t]he arbitrary and capricious standard applicable [in bid protests] is highly deferential." *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). Agencies, and contracting officers in particular, are "'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Savantage Fin. Servs. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (quoting *Impresa*, 238 F.3d at 1332).

Under Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"), a party may file a motion for judgment on the administrative record for the Court to assess whether an administrative body, given all disputed and undisputed facts in the record, acted in compliance with the legal standards governing the decision under review. *See Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 382 (2013) (citing *Fort Carson Supp. Servs. v. United States*, 71 Fed. Cl. 585 (2006)). On a motion for judgment on the administrative record, the parties are limited to the AR, and the Court makes findings of fact as if it were conducting a trial on a paper record. RCFC 52.1; *Bannum*, 404 F.3d at 1354. Looking to the Administrative Record, the Court must determine whether a party has met its burden of proof based on the evidence in the record. *Bannum*, 404 F.3d at 1355.

When a protestor claims that an agency's decision violates a statute, regulation, or procedure, the protestor must show that such alleged violation was "clear and prejudicial." *Impresa*, 238 F.3d at 1333. The Court will "interfere with the government procurement process 'only in extremely limited circumstances.'" *EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 223 (2005) (quoting *CACI, Inc.-Fed. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989)). "If the [C]ourt finds a reasonable basis for [an] agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989). The Court cannot substitute its judgment for that of an agency, even if reasonable minds could reach differing conclusions. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974).

## III. Discussion

### A. Cost Realism Analysis

In its Memorandum in Support of its Motion for Judgment on the Administrative Record, plaintiff states that the Agency's "expansion of its cost realism analysis to all labor rates in Agile's FPR1, regardless of whether they were more than one standard deviation below the average, was an abuse of discretion and inconsistent with the terms of the Solicitation." *See* Plaintiff's Memorandum in Support of its Motion for Judgment on the Administrative Record

(hereinafter "Pl.'s Mem.") at 19. Defendant and defendant-intervenor assert that the "ENCORE III solicitation required a cost-realism analysis of [CR] rates that fell more than one standard deviation below the average, and prescribed the methodology to be used for that analysis, but left DISA the discretion to decide whether to evaluate the cost-realism of other rates." Def.'s CMJAR at 19–20; *see also* Def.-Int.'s CMJAR at 4. For the following reasons, the Court finds defendant and defendant-intervenor's arguments persuasive.

The Court turns first to the pertinent language of the Solicitation. The Solicitation states: "The Government considers a rate that is 1 standard deviation below the average to be a realistic rate, subject to cost analysis techniques in accordance with FAR 15.404." AR 1919. Plaintiff argues that, based on this language, if a labor rate fell within one standard deviation below the average, then the rate is considered realistic and the Solicitation precludes the Agency from engaging in cost realism analysis for that rate. "Agile does not object to the cost realism analysis methodology set forth in the Solicitation. Rather, Agile objects to the Agency's abuse of discretion when it conducted a cost realism analysis of Agile's FPR1 that did not comport with the Solicitation's terms." *See* Pl.'s Mem. at 20. Out of the 116 LCATs, the Agency determined that Agile's salary surveys did not meet the requirements of the Solicitation for sixty-six LCATs. *See* Pl.'s Mem. at 2. Plaintiff argues that thirty-six of the LCATs found by the Agency as not meeting the minimum requirements of the Solicitation were "outside the bounds of any cost realism analysis," because the rates based on those LCATs were within one standard deviation below the average. Pl.'s Mem. at 2. Agile believes that the Agency should only have identified thirty LCATs as not meeting the requirements of the Solicitation and falling more than one standard deviation below the average. Finally, plaintiff states that if it "had revised only those 30 [LCATs], then its total evaluated price would have been [redacted], which is lower than that of two of the awardees." *See* Pl.'s Mem. at 23 (citing Pl.'s Ex. 2).

Defendant and defendant-intervenor argue that DISA's evaluation of Agile's proposed rates complied with the terms of the ENCORE III Solicitation. *See* Def.'s CMJAR at 19; Def.-Int.'s CMJAR at 3. Both defendant and defendant-intervenor specifically state that, while the Solicitation required cost realism analysis of rates that fell *more* than one standard deviation below the average, the terms of the Solicitation gave DISA discretion to conduct cost realism analysis of rates falling *within* one standard deviation below the average as the Solicitation cited to FAR 15.404. *See* Def.'s CMJAR at 19–20 (citing AR 1919). Defendant argues that the Agency's expansion of its cost realism analysis was permissible, as DISA noticed a potential discrepancy between Agile's LCATs and the [redacted] labor categories Agile used to develop its direct labor rates. *See id.* at 20. Defendant also contends that plaintiff's argument rests on an impermissible reading of the Solicitation because plaintiff's interpretation fails to recognize the inclusive language "subject to cost analysis techniques in accordance with FAR 15.404," which specifically includes cost realism analysis within its cost analysis techniques. *See id.* (citing AR 1919).

An agency's discretion in evaluating cost realism "'is bounded by the evaluation criteria stated in the solicitation' and any methodology to which the agency otherwise commits therein." *CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 379 (2010) (quoting *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 663 (2010)). The applicable test for an agency's violation of the evaluation criteria is found in *Beta Analytics International Incorporated v.*

*United States*. 44 Fed. Cl. 131 (1999). This test states that "if a protestor can demonstrate an instance in which a procuring official failed to abide by a mandatory solicitation provision, the protestor will prevail, provided it can demonstrate that, but for the violation, it had a substantial chance to receive the award." *Beta Analytics*, 44 Fed. Cl. at 138. For the reasons that follow, the Court finds that the Agency abided by the terms of the Solicitation when it expanded its cost realism analysis to labor rates within one standard deviation below the average.

As defendant and defendant-intervenor point out, the Solicitation provides that a rate one standard deviation below the average is considered realistic, "subject to cost analysis techniques in accordance with FAR 15.404." AR 1919. FAR 15.404-1 defines "cost analysis" as "the review and evaluation of any separate cost elements and profit or fee in an offeror's or contractor's proposal, as needed . . . to determine cost realism." 48 C.F.R. § 15.404-1. Additionally, FAR 15.404-1(d) specifically includes cost realism as a permissible cost analysis technique used to evaluate proposals. *See id.* § 15.404-1(d). It is clear from the Solicitation that the Agency did not limit itself to only performing cost realism analysis on labor rates that were more than one standard deviation below the average. In fact, the only limitation within the Solicitation regarding cost realism analysis was the *requirement* that the Agency perform cost realism analysis on CR labor rates that were more than one standard deviation below the average. *See* AR 1919. "Unless a specific methodology for conducting this analysis has been specified, agencies have broad discretion to determine the realism of a cost proposal." *CSC Gov't Sols. LLC v. United States*, 129 Fed. Cl. 416, 431 (2016).

After careful review, the Court finds that the language in the Solicitation was not so limited as to prevent the Agency from performing cost realism analysis on labor rates that fell within one standard deviation of the average. The terms of the Solicitation are unambiguous. Moreover, as the Agency did not violate the terms of the Solicitation, the Court need not determine whether Agile had a substantial chance to receive the award in accordance with the test in *Beta Analytics International v. United States*. The Solicitation includes the qualifying clause allowing for cost realism analysis under FAR 15.404, and the record reflects that the Agency operated within the terms of the Solicitation and the framework of the FAR. As such, the Court finds that the Agency did not abuse its discretion or violate the terms of the Solicitation when it expanded its cost realism analysis to labor rates within one standard deviation below the average.

### B. Agency's Evaluation of Agile's Labor Rates

Next, plaintiff asserts that the "Agency's determination that Agile's proposal did not meet the required education and experience levels was an abuse of discretion, contrary to the Solicitation's terms, and arbitrary and capricious." Pl.'s Mem. at 24. Defendant and defendant-intervenor argue that DISA appropriately raised concerns about Agile's supporting documentation for its direct labor rates. *See* Def.'s CMJAR at 22. For the reasons that follow, the Court finds defendant and defendant-intervenor's arguments persuasive.

"The standard against which the court measures the procuring agency's conduct is whether the Government's conduct was arbitrary and capricious." *Beta Analytics*, 44 Fed. Cl. at 137 (citing 28 U.S.C. § 1491(b)(4)). As stated above, "[t]he Solicitation required offerors to

include years of experience and education degree for each of the labor categories in its Cost/Price Proposal." Pl.'s Mem. at 24. The Solicitation also required that offerors submit "pricing methodology and supporting cost information utilized in the development of CR rates," along with information on the proposed direct labor rates such as salary survey data and payroll records. *See* AR 1903. Agile submitted salary survey information as supporting documentation for its direct labor rates, relying only on the [REDACTED] until its second FPR. *See id.* at 2033. Agile chose a labor category from the [REDACTED] that aligned approximately with the requirements for the LCATs in the ENCORE III Solicitation. *See id.* at 2041–47. However, the Agency determined that sixty-six of Agile's [REDACTED] labor categories did not meet the required number of years of experience found in the corresponding LCATs. *See id.* at 65498. Plaintiff specifically argues that "it was improper for the Agency to consider the salary surveys in assessing whether Agile met the minimum education and experience levels," and the Agency "lacked a rational basis for concluding that Agile's proposed education and experience levels listed in its supporting documentation did not meet the Solicitation's minimum requirements." Pl.'s Mem. at 25. However, as defendant and defendant-intervenor highlight in their briefs, plaintiff fails to appropriately characterize the basis for the Agency issuing the notice, ignoring the inherent risk in its cost-estimating methodology.

Overall, the Agency is entitled to a high degree of deference when engaging in discussions with offerors. The primary objective of discussions is to "maximize the Government's ability to obtain best value." 48 C.F.R. § 15.306(d)(2). DISA was required to discuss with "each offeror . . . deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." *Id.* § 15.306(d)(3). Importantly, "[t]he scope and extent of discussions are a matter of contracting officer judgment." *Id.* § 15.306(d)(3). Agile-COST-6A adequately communicated the Agency's concerns when it stated "[t]he Government is uncertain if the direct labor supporting documentation accurately represents and correlates to the proposed Years of Experience or Educational Degree, as the lower end of the range would not meet the [Solicitation] requirements." AR 65499. The potential mismatch involved, for example, an Agile [REDACTED] rate providing for an employee with three to six years of experience with the LCAT requiring at least six years of experience. While the range included the minimum-required experience level, the lower years of experience would not meet the requirements for the LCAT. Additionally, if Agile used the [REDACTED] salary percentile—which Agile utilized in some of its mismatched direct labor rates—then it stands to reason that the salary would likely be for an employee at the lower end of the range of years of experience. The significant impact that this discrepancy had on Agile's TEP also justified the Agency's concerns, as the evaluators found the below-average CR rates within the sixty-six LCATs to be unrealistic, and therefore these rates were adjusted upward to the average. Due to the high degree of deference owed to the Agency, and its reasonableness in requiring that Agile account for the mismatch in salary survey data, the Court finds that the Agency's conduct was not arbitrary or capricious.

### C. Agency Discussions

Finally, plaintiff argues that DISA engaged in misleading discussions with Agile. *See* Pl.'s Mem. at 27. Defendant and defendant-intervenor respond by alleging that plaintiff's claim of misleading discussions is untimely. *See* Def.'s CMJAR at 26–27. They also argue plaintiff

cannot show that its interpretation of the EN was reasonable or that the EN contained misleading content. *See id.* at 27–28. They further argue that the EN logically raised concerns by the Agency. These had to be addressed. *See id.* at 30–31. Based on the record as a whole, the Court does not believe that DISA engaged in misleading discussions with Agile.

As an initial matter, defendant-intervenor contends that Agile's argument regarding the Round 5 EN is untimely. *See* Def.-Int.'s CMJAR at 8 (citing *Blue & Gold Fleet, LP v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007)). Plaintiff responds by stating that defendant-intervenor's timeliness argument cites to patent ambiguities, and plaintiff's argument relies on a latent ambiguity in the discussions. *See* Pl.'s Reply at 16. For the specific purposes of the arguments provided in this case, the Court accepts that if an ambiguity exists, it is latent.

"For discussions to be meaningful, and therefore adequate, they must 'generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit.'" *See D&S Consultants, Inc. v. United States*, 101 Fed. Cl. 23, 40 (2011) (citing *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 384 (2003)). Misleading discussions are "communications from the government that are incorrect, confusing[,] or ambiguous." *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 670 (2010). Additionally, discussions are misleading "when the agency misdirect[s] the protestor as it revises its proposal." *Greenland Contractors I/S v. United States*, 131 Fed. Cl. 216, 225 (2017). The pertinent sections of Agile-COST-6A state:

> The offeror's Educational Degree and Years of Experience proposed within the Pricing Spreadsheet meet the minimum education and experience required by the RFP in Section J, Attachment G-2. However, for 66 labor categories listed below, it appears that the salary survey Educational Degree or Years of Experience range does not meet the minimum required by the RFP in Section J, Attachment G-2. . . . The Government is uncertain if the direct labor supporting documentation accurately represents and correlates to the proposed Years of Experience or Educational Degree, as the lower end of the range would not meet the RFP requirements. Request the offeror explain any adjustments to the salary data (for example, utilizing a higher salary percentile) to ensure the minimum years of experience and education requirements are met. Request the offeror review or revise the proposed direct labor rates and supporting salary survey as necessary. Ensure that any direct labor supporting documentation accurately represents and correlates to the proposed Years of Experience and Educational Degree. Failure to provide adequate supporting cost information may result in the offeror's CR rates being adjusted and the offeror's FP rates being determined to present too high of a performance risk for the Government to make an award.

AR 65498–65500. The Court reads the Agency's EN and finds no ambiguity or misleading language. The Agency never required Agile to change any [redacted] categories to different categories encompassing ranges above the minimum experience required by the LCATs. In fact, Agile only made this increase for some of the sixty-six LCATs identified by Agile-COST-6A. *See, e.g.*, AR 68298.

In making its argument, Agile identifies a separate offeror that received a similar EN regarding the Agency's concern over the supporting data for the direct labor rates correlating to the proposed years of experience and education required by the Solicitation. *See* Pl.'s Mem. at 31–32. The offeror, in its response, adequately resolved DISA's issues with its proposal by affirming it would hire an individual with the years of experience required under the specific LCAT. AR 77956. However, the fact that the Agency accepted that particular offeror's response does not mean that it expected that same response from Agile. The Agency, in Agile-COST-6A, cites different ways for Agile to address the EN—including utilizing a higher salary percentile—but never suggested that Agile change its supporting salary survey data to encompass a range above the minimum experience required by the Solicitation.

Additionally, plaintiff argues that the Agency engaged in misleading discussions during the Round 5 EN by stating that Agile might be ineligible for award because Agile's FP rates presented too high of a performance risk without adequately addressing the issues raised in Agile-COST-6A. *See* Pl.'s Mem. at 34 (citing AR 65500). Overall, plaintiff cites to ENCORE III awardees that had unrealistic pricing and argues that Agile's risk of performance was similar to those awardees because Agile received acceptable ratings for non-price factors. *See id.* Defendant argues that the EN merely stated "a general proposition that, in the absence of adequate support, CR rates could be adjusted and FP rates could be determined 'to present too high of a performance risk' for award." *See* Def.'s CMJAR at 31 (citing AR 1918–29; 48 C.F.R. § 15.404-1(d)). Defendant also points out that the Agency never represented the likelihood that Agile's FP rates would present too high of a risk if Agile did not respond. *See id.* The Court agrees with defendant and finds that the Agency never overstated its concerns regarding Agile's FP labor rates. Accordingly, the Court does not find that the Agency engaged in misleading discussions with Agile.

## IV. Conclusion

For the reasons set forth above, plaintiff's MOTION for Judgment on the Administrative Record is **DENIED**. Defendant and defendant-intervenor's CROSS-MOTIONS for Judgment on the Administrative Record are **GRANTED**. The Clerk is directed to enter judgment in favor of defendant and defendant-intervenor, consistent with this opinion.

**IT IS SO ORDERED.**

s/ Loren A. Smith

Loren A. Smith,
Senior Judge